IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.  4:19-CR-00578-DPM |
| | ) | |
| ANTWANE NELSON | ) | |

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

The United States of America, by and through its attorney, Cody Hiland, United States Attorney for the Eastern District of Arkansas and Edward Walker, Assistant United States Attorney for said district, for its response to Defendant Antwane Nelson's Motion to Suppress respectfully submits:

**RELEVANT FACTS**

On August 6, 2010, judgment was entered against Defendant Antwane Nelson in the United States District Court for the Eastern District of Arkansas, Case Number 4:08CR00424-01 BSM, for conspiracy to possess with the intent to distribute and distribution of cocaine base and possession of contraband in prison.  His sentence was ultimately reduced to 151 months' imprisonment on November 25, 2014.

On June 21, 2017, while on parole for an Arkansas conviction, Nelson signed an Arkansas Community Correction warrantless search waiver as part of his Arkansas state parole release provision/ conditions of release that stated:

> As a condition of my supervised parole or probation, I agree to allow any Arkansas Community Correction officer, or any certified law enforcement officer, to conduct a warrantless search of my person, place of residence, or motor vehicle at any time, day or night, whenever requested by the Arkansas Community Correction officer, or certified law enforcement officer.

1

> I understand that a warrantless search based on this waiver must be conducted in a reasonable manner but does not need to be based on a clearly expressed suspicion that I am committing or have committed a criminal offense.
>
> Arkansas law code annotated § 16-93-106 requires this waiver to be signed by a person who is placed on supervised probation or is released on parole under this section as a condition of his or her supervised parole or probation.

At some point prior to August 8, 2019, the GET-Rock Task Force received information that illegal drug activity was occurring at 1600 Booker in Little Rock, located in a high-crime area. GET-Rock did not receive a specific name of an individual from the tip, but was alerted that significant drug activity was occurring at that address. As a result, Special Agent (SA) Joshua Hubbard and Task Force Officer (TFO) Nick Simmons conducted surveillance of the area to investigate any potential illegal drug activity occurring at 1600 Booker.

While surveilling the address on August 8, 2019, at approximately 5:50 pm, GET-Rock observed Nelson sitting in a Dodge Charger outside of 1600 Booker with the vehicle running. Meanwhile, a Ford Explorer pulled behind the Charger. Two women exited the Explorer to unload groceries, and Nelson exited the Charger to speak with the two women. Without turning on any blue lights, SA Hubbard pulled up behind the parked Explorer.

SA Hubbard and TFO Simmons were the only two law enforcement officers that approached Nelson. Other law enforcement officers remained away from Nelson's vehicle in unmarked vehicles until it was determined to take Nelson into custody. Neither SA Hubbard nor TFO Simmons removed their weapons from their holsters at any time during the encounter.

The United States anticipates that SA Hubbard would testify that, when he approached Nelson, he noticed that Nelson's breathing became labored, he was extremely nervous, and that Nelson answered questions as though he had to hide his reason for being at 1600 Booker. When agents asked Nelson about the Charger, he denied the car was his and asserted that it belonged to

2

his mother. When SA Hubbard requested that Nelson provide registration for the vehicle, Nelson first opened the glove box to provide the proof of registration.[1] Nelson then opened the center console of the Charger to search for the registration. Upon opening the center console, SA Hubbard saw the corner of a plastic bag in plain view that he believed, based on training and experience, to contain contraband considering all of the circumstances presented. SA Hubbard would testify that it appeared that Nelson realized SA Hubbard saw the plastic baggie, and quickly closed it to avoid SA Hubbard's further observation. Nelson did not search through the center console as thoroughly as he did the glove box. SA Hubbard interpreted this action as evasive.

Nelson stated he was assigned to a halfway house for the Bureau of Prisons, and was supposed to report to work at 6:00 p.m. Prior to searching the vehicle, law enforcement ran Nelson's criminal history and learned that he had drug trafficking priors. They also verified that he had a warrantless search waiver and was on parole with the State of Arkansas. SA Hubbard believes he would have run the vehicle registration prior to the search of the vehicle. A recent check of the vehicle registration lists the vehicle owner as Linda Benton, 3011 West 14th Street, Little Rock, AR 72204.

TFO Simmons conducted a lawful search of Nelson's Charger based on the warrantless search waiver. TFO Simmons retrieved a plastic bag from the center console, which contained suspected narcotics, specifically approximately 15.1 grams of a white powdery substance. The 14.2882 grams of cocaine hydrochloride located in the center console was sitting inside a plastic bag on top of recent bills addressed to Nelson at 1600 Booker Street, including two Entergy bills and one CenterPoint energy bill. The white powder resembled cocaine, and field tested positive for cocaine.

---

[1] There is no indication that Nelson objected to the search of the vehicle.

At the time of the search, Nelson was assigned to a halfway house for the Bureau of Prisons. Nelson's neighbor told officers that Nelson had been living at 1600 Booker Street for two months. Subsequent crime lab analysis confirmed that the white powdery substance was 14.2882 grams of cocaine hydrochloride.

## LAW AND ARGUMENT

**I.     INITIAL ENCOUNTER WITH LAW ENFORCEMENT**

**A.     The initial encounter with law enforcement was consensual, and therefore, the Fourth Amendment is not implicated.**

Nelson asserts that law enforcement's initial contact with Nelson constitutes a seizure, relying, in part on Nelson's allegation that law enforcement activated flashing lights, which is in dispute. As Nelson concedes, however, if an encounter is consensual, it is not a seizure because "the Fourth Amendment is not implicated, and the officer is not prohibited from asking questions." *United States v. Munoz*, 590 F.3d 916, 921 (8th Cir. 2010).

> Whether an encounter is consensual depends on the facts of the case. [*United States v. Jones,* 269 F.3d 919, 925 (8th Cir. 2001)]. "A seizure does not occur simply because a law enforcement officer approaches an individual and asks a few questions or requests permission to search an area." [*United States v. Flores,* 474 F.3d 1100, 1103 (8th Cir. 2007)]. A person is seized within the meaning of the Fourth Amendment when, under the totality of the circumstances, "a reasonable person would have believed that he was not free to leave." *Jones,* 269 F.3d at 925. Circumstances of a seizure may include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Flores,* 474 F.3d at 1103, *quoting United States v. White,* 81 F.3d 775, 779 (8th Cir. 1996); *see also United States v. Nunley,* 873 F.2d 182, 184-85 (8th Cir. 1989) (defendant was seized when officers' statements were more than routine questioning, and suggested to defendant that she was the particular focus of an investigation).

*Munoz*, 590 F.3d at 921. The Eighth Circuit has found that "[i]n the absence of some such evidence, otherwise inoffensive conduct between a member of the public and the police cannot, as

a matter of law, amount to a seizure of that person." *United States v. Barry*, 394 F.3d 1070, 1075 (8th Cir. 2005). "The Supreme Court has made it abundantly clear 'that mere police questioning does not constitute a seizure.'" *Id*. at 1074.

"[I]f a reasonable person feels free to 'disregard the police and go about his business,' the encounter is consensual." *Munoz*, 590 F.3d at 921 (quoting *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)). "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Id*. (quoting *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988)).

For example, in *United States v. Hathcock*, 103 F.3d 715, 718-19 (8th Cir. 1997), the Eighth Circuit found that the encounter with law enforcement was consensual where the officer approached the defendant, showed him his badge, introduced himself as with the Narcotics Unit of the Omaha Police, and stated he wanted to ask the defendant a few questions because he was at the airport to identify possible drug couriers.  The Court relied on the lack of "any evidence of threats or coercion," that the length of the exchange lasting only about three minutes, that the encounter occurred in a public area, that law enforcement displayed no weapon and made no attempt to limit the defendant's "mobility through any touch." *Id*. at 719 (citing cases).

Similarly, in *Barry*, the Eighth Circuit noted that courts have declined to find there was a seizure where "two plain-clothed police officers approached a running vehicle stopped at an intersection, displayed their badges, asked the vehicle's occupants to roll down the window, and questioned the occupants." 394 F.3d at 1076-77 (citing *United States v. Baker*, 290 F.3d 1276, 1277 (11th Cir. 2002)).  The Court cited a number of cases where "police-citizen encounters did

not implicate the Fourth Amendment." *Id*. at 1077 (citing *United States v. Gipp,* 147 F.3d 680, 684–85 (8th Cir. 1998) (holding a highway patrol officer can approach a parked vehicle on a frontage road at 7:45 p.m. to see if there are any problems without offending the Fourth Amendment); *United States v. Dockter,* 58 F.3d 1284, 1287 (8th Cir. 1995) (ruling that individuals "were not seized within the meaning of the Fourth Amendment when [a sheriff's deputy] pulled his vehicle [directly] behind their parked car and activated his amber warning lights"); *United States v. Kim,* 25 F.3d 1426, 1430 n. 1 (9th Cir. 1994) (recognizing other circuit courts "have consistently held that an officer's approach of a car parked in a public place does not constitute an investigatory stop or higher echelon Fourth Amendment seizure"); *Commonwealth v. Eckert,* 431 Mass. 591, 728 N.E.2d 312, 316 (2000) (concluding "that, by walking up to the defendant's parked vehicle at the rest area, knocking on the window, shining his flashlight inside and asking whether the defendant was 'all set,' [a state trooper] did not engage in any conduct that requires constitutional justification, as he neither asserted nor implied that the defendant was not free at that moment to ignore this inquiry into his well-being")).

Here, contrary to Nelson's argument, the Fourth Amendment was not initially implicated with law enforcement's approach of Nelson's vehicle. Only two law enforcement officers were present during the initial encounter, their weapons remained holstered, Nelson does not even allege that any physical touching occurred, and there is nothing about the language or tone of voice used by law enforcement indicating compelled compliance upon the initial approach.

**B.     Even if the initial encounter constituted a *Terry* stop, the officers lawfully approached Nelson.**

Nelson argues that law enforcement wrongfully seized Nelson or conducted a *Terry* stop, primarily relying on the claim that law enforcement used flashing lights when they parked behind the Explorer. Again, it is anticipated that SA Hubbard would testify to the contrary. Nelson then

makes the conclusory argument that "there were at least two officers and likely more" and "officers indicated that compliance with their requests might be compelled by demanding to see the Charger's registration." While other law enforcement were in their vehicles away from the initial encounter, only two law enforcement officers made contact with Nelson prior to the decision being made to take him into custody. The other vehicles were unmarked.

Although the United States maintains that the initial encounter was consensual, in the alternative, law enforcement had reasonable suspicion to conduct a *Terry* stop. "The Fourth Amendment permits an investigative stop of a vehicle if officers have a reasonable suspicion that the vehicle or its occupants are involved in criminal activity." *United States v. Bell*, 480 F.3d 860, 863 (8th Cir. 2007). "Police must have a 'particularized and objective basis' for suspecting criminal activity at the time the stop is made." *United States v. Spotts*, 275 F.3d 714, 718 (8th Cir. 2002) (quoting *United States v. Thomas*, 249 F.3d 725, 729 (8th Cir. 2001). However, "the standard employed is less demanding than the standard of probable cause that governs arrests and full-scale Fourth Amendment searches, both with respect to the amount of supporting information that is required to establish reasonable suspicion and with respect to the degree of reliability that the information must exhibit." *Id.* (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)). While "reasonable suspicion" must be more than an inchoate "hunch," the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968) and *INS v. Delgado*, 466 U.S. 210, 217 (1984)).

In determining whether an officer had reasonable suspicion, the Court must consider the totality of the circumstances in light of the officer's experience. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (finding, that "[t]his process allows officers to draw on their own experience and

specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."). "Factors that may reasonably lead an experienced officer to investigate include the time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence." *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir. 1995). *See also United States v. Cornelius*, 391 F.3d 965, 967 (8th Cir. 2004) (noting that past illegal drug activity and a suspect nervously placing his hand in his pocket is properly considered in determining reasonable suspicion) (citing *United States v. Hoosman*, 62 F.3d 1080, 1081 (8th Cir. 1995) and *United States v. Davis*, 202 F.3d 1060, 1063 (8th Cir. 2000)); *United States v. Trogdon,* 789 F.3d 907, 910 (8th Cir. 2015) (holding that circumstances such as a "high-crime area where violence and gang and narcotics activity was commonplace[]" contributes to an officers determination of reasonable suspicion.""); *United States v. Stewart*, 631 F.3d 453, 457 (finding that recent robberies of a nearby store gave rise to probable cause).

     Officers were conducting surveillance of the area because they had information regarding illegal drug activity at 1600 Booker, which is in a high crime area. Nelson was parked directly in front of that residence. Although Nelson claims that officers initiated their blue lights before pulling in behind the Explorer, it is anticipated that SA Hubbard would testify that he did not engage his blue lights prior to pulling in behind the Explorer at 1600 Booker Street. Law enforcement approached Nelson to ask a few questions in accordance with the tip from the informant about the address. Thereafter, law enforcement's reasonable suspicion was heightened when SA Hubbard observed Nelson's breathing become labored and that Nelson answered questions as though he had to hide his reason for being at 1600 Booker. His suspicions were only further heightened, and probable cause developed, when SA Hubbard saw the corner of a plastic

bag in plain view, which he believed to contain contraband based on his training and experience. Nelson's criminal history further supported reasonable suspicion and probable cause. Thus, even if the encounter became a *Terry* stop at some point, law enforcement had more than reasonable suspicion.

## II. THE SEARCH OF NELSON'S VEHICLE WAS LAWFUL

### A. Law enforcement had probable cause to conduct a warrantless search of Nelson's vehicle based on the plain view doctrine and the automobile exception to the warrant requirement.

Law enforcement had probable cause to conduct a warrantless search of Nelson's vehicle based on the information they had at the time of the search, including the informant's information regarding drug activity, Nelson's behavior, and the observation of the plastic bag in plain view. The Court should also consider Nelson's reduced privacy interest, in light of his status as a parolee.

Pursuant to the Fourth Amendment, "[a] warrantless seizure 'is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions.'" *United States v. Lewis*, 864 F.3d 937, 943 (8th Cir. 2017) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 474 (1971); *United States v. Harris*, 747 F.3d 1013, 1016 (8th Cir. 2014)). "Under the automobile exception, officers may search a vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of criminal activity." *United States v. Cortez-Palomino*, 438 F.3d 910, 913 (8th Cir. 2006) (per curiam). "Probable cause exists 'where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005)). Here, probable cause for the search of the vehicle was supported, in part, by law enforcement's observation of the plastic baggie in plain view. *United States v. Vinson*, 805 F.3d 1150, 1152 (8th

9

Cir. 2015). As set forth above, law enforcement was lawfully present outside Nelson's vehicle, in a position where the evidence could be observed in plain view.

In considering the totality of the circumstances, the Court must also consider that "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office[.]" *United States v. Martin*, 982 F.2d 1236, 1240 (8th Cir. 1993) (finding that officer's observation of a suspicious cellophane package of crack cocaine in plain view was constitutionally permissible, and seizure was inevitable) (quoting *South Dakota v. Opperman*, 428 U.S. 364, 367 (1976)). Also, "[a]n informant's tip can be sufficient to establish probable cause if … the tip 'is corroborated by independent evidence.'" *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002). "Evasive behavior, while not alone dispositive, is another fact supporting probable cause." *United States v. Jones*, 535 F.3d 886, 891 (8th Cir. 2009).

The Eighth Circuit has "held that simply observing the presence of containers that are known to typically contain illegal narcotics gives rise to probable cause to perform a warrantless search of a vehicle." *United States v. West*, 280 Fed. Appx. 563, 566 (8th Cir. 2008) (per curiam) (citing *Cortez-Palomino*, 438 F.3d at 913; *cf. Texas v. Brown*, 460 U.S. 730, 742-43 (1983) (officer's observation of a balloon tied in a manner consistent with trafficking illegal narcotics provided probable cause under the plain view doctrine)). In *Cortez-Palomino*, law enforcement observed "large packages wrapped in green cellophane[,]" observed the odor of axle grease and dryer sheets, and "[a]ll three troopers testified that their experience led them to believe that the green cellophane packages contained illegal narcotics." 438 F.3d at 913. The Court concluded that "[t]his provided probable cause for the officers to lower the tailgate and search the pickup without a warrant." *Id*.

In *West*, as to the plastic baggies observed in plain view, the officer testified that narcotics are commonly packaged in such baggies. 280 Fed. Appx. at 566. The Court found that the baggies combined with other suspicious behavior led law enforcement "to believe the Suburban contained evidence of a possible narcotics transaction[,]" and "readily conclude[d] that given the totality of the circumstances there was a fair probability for the officers to believe that evidence of narcotics activity would be found in the Suburban. *Id. See also United States v. Van Zee*, 380 F.3d 342, 344 (8th Cir. 2004) (finding agent had probable cause to search the defendant's truck where agent observed a glass tube that he reasonably believed was part of a glass "crank" pipe).

Although law enforcement lawfully searched the vehicle pursuant to the warrantless search waiver, as discussed below, they also had officers established probable cause to search the vehicle at the time of the search. Law enforcement had information that illegal drug activity was occurring at 1600 Booker Street, a high-crime area. After SA Hubbard's initial lawful approach and established reasonable suspicion based on the totality of the circumstances, SA Hubbard observed the corner of a plastic bag protruding from the center console in plain view. It is anticipated that SA Hubbard would testify that plastic baggies, such as the one in question, are commonly used to hold illegal narcotics. Nelson's suspicious behavior and past criminal activities further supported probable cause. Therefore, the search was lawful.

### B. Law enforcement lawfully searched Nelson's vehicle pursuant to his warrantless search waiver.

Because law enforcement had probable cause to search the vehicle, the Court need not address the warrantless search waiver. However, in the event the Court is inclined to reach the issue, the United States asserts that law enforcement lawfully searched Nelson's vehicle pursuant to his warrantless search waiver.

In *Samson v. California*, the Supreme Court held that the Fourth Amendment did not forbid police officers from conducting suspicionless warrantless searches of parolees. 547 U.S. 843 (2006) (where California law required that the defendant agree in writing "to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause"). The Supreme Court recognized that the parolee "did not have an expectation of privacy that society would recognize as legitimate," and that a State's interests in supervising its parolees "are substantial." *Id*. at 852-53. The Supreme Court emphasized, "this Court has repeatedly acknowledged that a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Id*. at 853.

Although law enforcement had, at a minimum, reasonable suspicion to search the vehicle for the reasons set forth above, Nelson concedes that "officers do not need reasonable suspicion or probable cause to conduct a search pursuant to a search waiver based on its express terms[.]" Def. Mot. at p. 6. However, he argues that the search was invalid under the waiver because law enforcement did not request to search the vehicle and the waiver provides that the parolee must allow the warrantless search "whenever requested."

While Nelson attempts to rely on an Idaho case in support of his argument, the Arkansas Supreme Court has rejected the argument that the consent provided by the search waiver was invalid where a defendant was not present at the search and officers did not request that he comply with the search. *McFerrin v. State*, 344 Ark. 671, 679 (2001). Similarly, in *Hatcher v. State*, 2009 Ark. App. 481, *4 (2009), the Arkansas Court of Appeals rejected the argument that the language "whenever requested to do so" placed a burden on a parole officer to verbally request entrance into

a residence, noting that any refusal would be futile. Such a requirement would undermine the rationale behind allowing for the warrantless search waiver and the state's interests in monitoring its probationers and parolees. Thus, Nelson's arguments are unavailing.

Nelson further argues that the search was invalid because law enforcement lacked reasonable suspicion to believe that the vehicle was Nelson's for purposes of the search waiver. *See e.g., United States v. Reed*, 921 F.3d 751, 755 (8th Cir. 2019) (finding that officers executing an arrest warrant "may enter the residence of the person named in the warrant if they have a reasonable belief that the suspect resides at and is currently present at the dwelling" and stating that a "reasonable belief is based upon the totality of the circumstances known to the officers prior to entry.").

However, during the surveillance, Nelson was the sole occupant and possessor of the vehicle. Law enforcement witnessed Nelson sitting in the driver's seat of the running vehicle and in control of it. Although Nelson claimed that the vehicle was registered to his mother, even if that were the case, it is anticipated that SA Hubbard would testify that, in his experience, those engaged in narcotics trafficking often use vehicles registered in the name of another person.

The items found within the vehicle further support the conclusion that the vehicle was Nelson's. Nelson's utility bills, as well as a bank statement, were located within the vehicle. Also, cocaine was found in the vehicle, and Nelson previously served a federal sentence for a cocaine base offense. Nelson does not claim that the cocaine in the vehicle belonged to his mother. Interestingly, defense counsel provided an affidavit of an individual who claimed to work on "a black Dodge Charger for a longtime customer of mine named Antwane Nelson in early August 2019." While the remaining claims in the affidavit, including a claim that another person placed

the cocaine in the vehicle, have not been established, Nelson's own theory of the case indicates that the vehicle was Nelson's.

Just as a house need not be in the name of the parolee to cause it to be subject to search under a warrantless search waiver, the search waiver does not require that the vehicle be registered to the parolee in order to subject it to search. *See United States v. Morgan*, 659 Fed. Appx. 444, 446 (9th Cir. 2016) (unpublished) (rejecting argument that search of the vehicle was unauthorized by the probation agreement because defendant "merely possessed rather than owned the car" where defendant was in possession of the car, alone made repeated trips to the car, placed a backpack in the trunk, was apprehended in the driver's seat, the car was parked at the apartment believed to be defendant's residence, and the car was formerly owned by an associate). In *McFerrin*, the home searched belonged to the defendant's sister, who was on parole, and the Arkansas Supreme Court upheld the search noting that "a parolee's advance consent is valid because the parolee remains in the custody of the penal institution from which he is released, and the 'special needs of the parole process call for intensive supervision of the parolee making the warrant requirement impractical.'" 344 Ark. at 679.

Here, there is no question that Nelson was in control of and in possession of the vehicle. *See United States v. Timlick*, 481 F.3d 1080, 1083 (8th Cir. 2007) ("[T]he holder of the key, be it to the dwelling, vehicle or motel room in question, has constructive possession of the contents therein.") (quoting *United States v. Brett*, 872 F.2d 1365, 1369 (8th Cir. 1989)). As the driver and sole occupant of the vehicle, Nelson had the authority to consent to the search of the vehicle. *United States v. Eldridge*, 984 F.2d 943, 948 (8th Cir. 1993) ("The driver of a car has the authority to consent to the search of that vehicle."). As in *McFerrin*, his advance consent was valid under the warrantless search waiver, even if he was not the registered owner of the vehicle.

"[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Riley v. California*, 573 U.S. 373, 381 (2014) (cleaned up)).  "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials." *Id*. at 60-61.  Even if the vehicle was registered to Nelson's mother, the totality of the circumstances justified law enforcement's reasonable belief that this was Nelson's vehicle because the information known to them indicated that the vehicle was used and controlled by Nelson.  Therefore, the vehicle was subject to search by virtue of the warrantless search waiver.

## CONCLUSION

The warrantless search of Nelson's vehicle was lawful under the Fourth Amendment and pursuant to the search condition related to his parolee status. All evidence seized during the lawful search is admissible and suppression of the evidence is inappropriate.

THEREFORE, the United States respectfully requests that this Court deny the Nelson's Motion to Suppress Physical Evidence.

CODY HILAND
United States Attorney

EDWARD O. WALKER
AR Bar # 2000076
Assistant U.S. Attorney
P.O. Box 1229
Little Rock, AR 72203
501-340-2600
Edward.O.Walker@usdoj.gov